IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Tercilmene Monera                                    Case No.

                        Petitioner,

v.

Evens Datis

                        Respondent.

_____/

**VERIFIED PETITION FOR RETURN OF MINOR CHILD TO BRAZIL
AND REQUEST FOR ISSUANCE OF SHOW CAUSE ORDER**

Petitioner, Tercilmene Monera (the "Mother" or "Petitioner"), a resident of Brazil and citizen of Haiti, files this Verified Petition ("Petition") seeking the return of her five-year-old daughter, H.E.D. ("H.E.D." or "Child"), to Brazil and for issuance of a show cause order as a result of the wrongful retention of the Child by her father, Respondent, Evens Datis (the "Father" or "Respondent") in the United States. Petitioner respectfully seeks a judicial resolution of this Petition within six weeks, as provided for by the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11670, 19 I.L.M. 1501 (the "Hague Convention" or "Convention"). In support of this Petition, Petitioner states as follows:

**INTRODUCTION**

1.      On July 17, 2022, the Father violently abducted H.E.D. from the Mother in Brazil. The Mother spent months and years trying to locate H.E.D. and obtain the return of the Child to her, to no avail. In August 2023, via TikTok, the Mother saw that the Father had H.E.D. in West Palm Beach, Florida, United States of America. The Father has wrongfully retained the Child in Florida without the Mother's knowledge or consent.

2.      Despite the Mother's frequent pleas and communications requesting the Child's return, the Father never returned the Child to Brazil. Instead, and without the Mother's knowledge or consent, the Father (upon information and belief) enrolled the Child in school in the United States and refuses to speak to the Mother or to allow the Child to speak to the Mother.

3.      The Mother has not seen her Child in person since July 2022 when the Child was violently abducted from the Mother by the Father. The Mother has taken all appropriate legal action to try and locate the Child and hold the Father accountable for his wrongful actions, including, the Mother (i) communicated the abduction of her Child in the protective measures proceedings pending in Brazil; (ii) communicated the abduction of her Child in the divorce and custody proceedings pending in Brazil; (iii) obtained a Brazilian Court order mandating that the Child be returned to the Mother within forty-eight hours, which order the Father violated; (iv) requested support from the Guardia Maria de Penha program in Brazil; (v) went to the Brazilian police to obtain a search and seizure warrant for the Child; (vi) sought assistance from the child protective counsel and the local police station because the warrant was not executed; (vii) initiated a Judicial Assistance Process by the Public Defender's Office of the Union; and (viii) tried to locate the Father and Child herself via social media.

4.      The Mother has never stopped looking for her Child. Unfortunately, the Mother did not know where the Father or Child were located. The Mother was able to confirm that the Father was not in Brazil, but did not know where he would have taken himself and the Child.

5.      The Mother diligently searched for her Child and used the court system in Brazil in an attempt to find her Child and bring her home, but it was not until August 2023 that the Mother confirmed (with as much certainty as possible) that the Father and Child were located in West Palm Beach, Florida.

2

6.      The Father has alienated the Child, cut off the Mother's access to communicate with the Child, and is improperly holding the Child in the United States. The Mother also believes that both the Father and Child are in the United States illegally—potentially having traveled through Mexico—where the Father likely put the Child in grave danger to get to the United States.

7.      Within one year of the Mother confirming that the Father and Child were located in Florida, on May 19, 2023, the Mother filed an Application for Return with the Brazilian authorities.

8.      The Mother has rights of custody within the meaning of the Hague Convention, art. 3, and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9003(d) pursuant to Brazilian law, the country of the Child's habitual residence, and has continuously exercised those rights. The Mother has established and maintained an emotional and personal connection to the Child through communications, both, in person and via electronic means. By wrongfully failing to return the Child to her habitual residence in Brazil, the Father breached the Mother's rights of custody under both Brazilian law and the Hague Convention. The Father's retention of the Child in the United States is wrongful within the meaning of the Convention and ICARA. The Mother is entitled to a return order mandating the Child's return to Brazil forthwith.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction pursuant to 22 U.S.C. § 9003(a) and because this case involves the wrongful removal and retention of a child under the age of sixteen from her habitual residence in Sao Paolo, Brazil, to the United States.

10.     This Court has personal jurisdiction because Father and the Child, upon information and belief, are located in this judicial district. Venue is proper in this Court because the Child is believed to be located at a home occupied by the Father in Palm Beach County, Florida, within the

3

Southern District of Florida. 22 U.S.C. § 9003(b).

## HAGUE CONVENTION

11.     This Petition is brought pursuant to the Hague Convention and its implementing legislation, ICARA, 22 U.S.C. § 9001, *et seq*.[1] Brazil and the United States have been treaty partners under the Hague Convention since 2003.

12.     The Hague Convention is an international treaty designed "to secure the prompt return of children wrongfully removed to or retained in any Contracting State, and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010) (quoting Convention art. 1) (internal quotation marks omitted).

13.     The Hague Convention provides that the removal or retention of a child is wrongful where it is in breach of a person's rights of custody, either jointly or alone, under the law of the country in which the child was habitually residing immediately before the wrongful removal or retention. *See* Convention, art. 3.

14.     Rights of custody may arise: (a) by operation of law; (b) by reason of a judicial or administrative decision; or (c) by reason of an agreement having legal effect under the law of the country of habitual residence. *See* Convention, art. 3. The Hague Convention expressly allows United States courts to take notice of the laws of other courts regarding custody determinations. *See* Convention, art. 14.

15.     The "central operating feature" of the Convention is a return order. *Abbott*, 560

---

[1] The text of the Hague Convention and ICARA can be found in Appendices A and B to the guide for federal judges published by the Federal Judicial Center. Garbolino, James D., *The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges* (Fed. Jud. Ctr., 2d ed. 2015). *See* https://www.fjc.gov/content/309626/1980-hague-convention-civil-aspects-international-child-abduction-guide-judges (last visited July 13, 2022).

U.S. at 8. When presented with a wrongful removal or retention, "the country to which the child has been brought must order the return of the child forthwith," absent the applicability of certain narrow exceptions to return. *Id*. A removal or retention is "wrongful" where the child was removed from its habitual residence or retained in another country in violation of "rights of custody." *Id*. Rights of custody for purposes of the Convention "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id*. (quoting Convention, art. 5(a)) (internal quotation marks omitted). A return order does not modify pre-removal rights of custody; it simply allows the proper court in the child's habitual country of residence to allocate those rights. *Id*. (citing Convention, art. 19).

16.     The Hague Convention authorizes a federal district court to determine the merits of a claim for wrongful removal or retention of a child. *See Pielage v. McConnell*, 516 F.3d 1282, 1286 (11th Cir. 2008) (quoting *Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004)). The Convention does not, however, permit the district court to consider the merits of any underlying custody dispute. *Id*. Thus, the Mother's Petition seeks to enforce an international treaty and federal law concerning custody jurisdiction. This is not a child-custody case. Brazil, as the Child's habitual residence, is the country under the Convention that should make all custody determinations. *See* Convention, art. 16.

17.     Here, the Court must order the return of the Child to Brazil if the Mother establishes the following by a preponderance of the evidence: (1) the Child is under the age of 16; (2) Brazil was the Child's country of habitual residence immediately before the Child came to the United States and the Father wrongfully retained her in August 2023; (3) the retention of the Child in the United States is in breach of the Mother's rights of custody under Brazilian law; and (4) the Mother was exercising her rights of custody at the time the Father wrongfully retained the Child in the

United States. *See Convention*, art. 3; *Pielage*, 516 F.3d at 1286; *Lops v. Lops*, 140 F.3d 927, 935 (11th Cir. 1998).

18. Article 11 of the Hague Convention provides that judicial authorities of Contracting States "shall act expeditiously in proceedings for the return of the children," and the case is considered delayed if more than six weeks pass from the date a petition is filed before a final order. *See* Convention, art. 11.

## **FACTUAL BACKGROUND**

### A. *The Parties*

19. The Mother is a citizen of Haiti and resident of Brazil, where she has lived since August 2017. The Mother initially lived in Manaus and then settled in Sao Paolo.

20. Like the Mother, the Father is a Haitian citizen who was born in Haiti and moved to Brazil.

21. H.E.D. was born on January 28, 2019 in Sao Paulo/SP, Brazil. H.E.D. is a Brazilian citizen and has a Brazilian ID number and passport issued to her.

22. Upon information and belief, the Father is currently residing in West Palm Beach, Florida, where he is wrongfully retaining H.E.D..

### B. *The Parents' Relationship And Residence*

23. The Mother and Father got married in August 2018 after meeting in Brazil. The Mother and Father dated for three months and the Mother became pregnant with H.E.D.. The Mother and Father married as a result of the pregnancy. Many members of the Mother's family abandoned her after learning of her pregnancy out of wedlock. H.E.D. is the only child that was born from the Mother and Father's relationship.

24. When H.E.D. was born, the Mother and Father shared a residence in Sao Paolo/SP,

Brazil, where H.E.D. lived until the Father wrongfully retained H.E.D. in the United States. The Mother and Father intended to have Brazil be their permanent home, including the permanent home for H.E.D., and enrolled H.E.D. in her daycare in Brazil when she was four (4) months old.

25.     The Mother does not have any other children.

26.     Upon information and belief, the Father does not have any other children.

27.     The Father was physically and mentally abusive to the Mother, including when the Mother was pregnant with the Child.

28.     In September 2019, when the Child was eight months old, the Father physically assaulted the Mother by punching her in the head, which resulted in constant headaches and difficulty moving her neck. Two days later, on September 25, 2019, the Mother sought medical attention and reported the incident to the police, who advised her not to return home. The Mother picked the Child up from daycare and sought refuge at a women's shelter for victims of violence.

29.     Shortly thereafter, the Mother and Child moved in with the Mother's sister while the Mother saved money to find a place to live. The Mother and Child eventually moved in with the Mother's friend. From that point forward, the Mother, Child, and Father did not live together in the same house. The Mother and Father's relationship was on and off until 2021. While they were still together, the Father would visit the Child with no formal custody arrangement.

30.     In July 2021, the Father physically assaulted the Mother again, which prompted the Mother to block his phone number and take legal action. The Mother filed a police report on July 16, 2021. The Mother formally ended her relationship with the Father because of the ongoing domestic violence and for fear of her and the Child's safety.

31.     In August 2021, the Mother filed a lawsuit for divorce and custody arrangements. *See* **Exhibit A**. In that lawsuit, the Mother requested (1) sole custody of the Child with the Father

having altered weekend visitations but no overnight stays; (2) alimony payments for the Mother; and (3) the formalization of the divorce. In his response, which he filed in May 2022, the Father requested sole custody of the Child (alleging that the Mother was unfit to care for the Child), denied alimony for the Mother, and did not address the divorce. The Father also filed a police report claiming that the Mother took the Child to a favela in Sao Paolo without his authorization, which did not happen.

32.    After the divorce proceedings began, the Mother moved to a new location in Sao Paolo with the Child and, for the safety of both the Mother and Child, did not tell the Father where they lived. The Father lived in Paulinia, which is about 120 kilometers away from where the Mother and Child lived. The Mother occasionally took the Child to meet the Father at the bus station. In March 2022, the Father discovered the Mother's address, which led to him showing up at her home unannounced and uninvited.

### C.  *The Father Wrongfully Retains the Child in Brazil*

33.    On April 16, 2022, the Father asked the Mother to take H.E.D. for one day of his paternal visits because of the Easter holiday; and stated that he would return H.E.D. the same day. The Father did not voluntarily return H.E.D. to the Mother. The Father refused to return H.E.D. to the Mother and kept H.E.D. for several days. The Father threatened the Mother by demanding that the Mother "choose" between the Mother's new partner or the Child.

34.    On April 20, 2022, the Mother filed a request for protective measures, which resulted in a court order prohibiting the Father from approaching the Mother, provisionally granting sole custody of H.E.D. to the Mother, and forbidding the Father from visiting H.E.D., who was three years of age at the time. *See* **Exhibit B**. This decision also established that the Mother would retain full custody of the Child and the Father's visitation rights were suspended.

The police located the Child and returned her to the Mother's care via search and seizure.

35.     Separately, in May 2022, the Mother filed a lawsuit requesting alimony payments on behalf of the Child. *See* **Exhibit C**. No ruling has been made regarding the Father's obligation to pay alimony; however, the Father occasionally contributed financially to support the Child.

### D. *The Father Violently Abducts the Child from the Mother and Flees*

36.     On July 17, 2022, the Father appeared at the Mother's house—in violation of the recent court order suspending his visitation rights—asking to see the Child. The Mother refused. The Mother, scared of the Father's violent past, waited for the Father to leave the Mother's doorstep before reporting the incident to the police. After the Father left, the Mother took the Child and walked to the police station to report the Father's actions. While walking to the police station, the Father confronted the Mother and violently ripped the Child from the Mother's arms in broad daylight on the street. As a result of the Father's actions forcibly taking the Child from the Mother's arm, the Child suffered a dislocated clavicle.

37.     The Father left with the Child, upon information and belief, to Paulinia. The Mother reported this incident to the police, reported this incident in the protective measures proceedings, and reported this incident in the divorce and custody proceedings. *See* **Exhibit D**.

38.     In August 2022, the Brazilian court ordered the Child to be returned to the Mother within forty-eight hours. *See* **Exhibit E**. The Father did not return the Child. Rather, the Father responded and stated that he tried to contact the Mother to return the Child, but the Mother did not respond. *See* **Exhibit F**. This is not true and the Mother has no record that the Father tried to return the Child. The Mother informed the court that she tried to arrange for the Child's return, but that the Father thwarted all opportunities. *See* **Exhibit G**. The Judge ordered a search and seizure for the Child, but there was delay in the execution because the Father was in a different city. *See*

Exhibit **H**.

### E.  *The Mother Searches for her Child*

39.     After the Father violently abducted the Child from the Mother, the Mother diligently searched for her Child to obtain her return. The Mother was unable to confront the Father directly without police support because she was scared that the Father would physically abuse or harm her or her Child, which he had done in the past.

40.     The Mother called and message the Father, but he did not answer or respond.

41.     In August 2022, the Mother went to the prosecutor's office to request support from the Guardia Maria de Penha program to remove the Child from the Father's care, but was told that she would need a "specific decision."

42.     That same month, the Mother requested search and seizure of the Child from the police. A precatory letter was issued for the Paulina police station to execute the search and seizure warrant. In September 2022, the Mother asked for an update on the search and seizure and a new decision was issued that included the urgent nature of the search and seizure warrant.

43.     In October 2022, the Mother sought assistance from the child protective council and the local police station because the search and seizure warrant was not being executed upon. The Mother's request was granted and the Paulinia court issued an official communication. Again, the Mother requested an update on the search and seizure and another decision was issued that stated the urgent nature of having the warrant executed.

44.     Finally, in November 2022, the bailing issued a statement to the Mother that they attempted to execute the search and seizure warrant on the Father, but that the Father's neighbors stated he no longer lived at the residence in Brazil. *See* **Exhibit I**. The neighbors indicated that the Father may have left Brazil and was in Mexico.

10

45.     The Mother was able to confirm that the Father was in Mexico possibly trying to immigrate to the United States by following his social media accounts (mainly, TikTok). The Father left with the Child and without the Mother's consent. The Federal Police could not locate proper migration records for the Father or Child, indicating that the Father may have migrated with the Child *illegally*.[2]

46.     In March 2023, the Public Defender's Office of the Union initiated a Judicial Assistance Process. Seven months later, the Department of Asset Recovery and International Legal Cooperation informed the Mother of the proper legal avenue of how to get the Child back to Brazil. Thereafter, in February 2024, the Mother contacted lawyers for assistance.

47.     In August 2023, the Mother was able to confirm, with as much certainty as possible, based on the location stamp of the Father's TikTok videos on social media, that the Father and the Child are located in West Palm Beach, Florida.

48.     Since August 2023, upon information and belief, the Father has: (i) unilaterally and illegally failed to secure the Child's return to her home in Brazil; (ii) unilaterally and illegally enrolled the Child in daycare in Florida; (iii) illegally prevented the Mother from having frequent visitation with the Child; and (iv) illegally prevented the Mother from communicating with the Child.

49.     To this day, H.E.D. remains wrongfully retained by the Father in the Father's

---

[2] As part of the divorce proceeding, the Immigration Police Department, a branch of Federal Police responsible for monitoring entry and exit from Brazil, presented a document stating that there was no information regarding the use of the Father's or the Child's passport in Brazil. While the Mother did not authorize the Father to leave the country with the Child, the Child's passport contains a travel authorization allowing her to travel with either parent, interchangeably, during the validity of the document (which was through May 20, 2024). Notwithstanding, there appear to be no records that the Father traveled out of Brazil legally with the Child and, upon information and belief, the Father and Child did not travel legally into the United States.

#505681840_v4

residence in West Palm Beach, Florida, and has not seen her Mother in person since July of 2022.

50.    The effect of the Father's unlawful retention of H.E.D. cannot be overstated. Since the unlawful retention of H.E.D., the Mother has suffered great emotional distress which has been exacerbate by the Father's past violent history (both against the Mother and Child) and the Father's deliberate alienation of H.E.D. from the Mother.

51.    The Father is currently facing a criminal case in Brazil related to minor bodily injury in the context of domestic violence against the Mother.

### F.   *The Father's Alienation of the Child From Her Mother*

52.    The Father is deliberately and actively alienating the Child from the Mother. Due to the Child's age, the Mother has no option but have the Father facilitate the communications between her and the Child. The Father will not respond to the Mother or coordinate communication between the Child and the Mother. Upon information and belief, the Father has blocked the Mother's phone number.

53.    To this day, the Father ignores the Mother's messages and requests for her Child.

54.    Since the abduction, the Mother has had no information about the Child's exact whereabouts, and looks at the Father's social media accounts to get any information she can.

55.    Despite the alienation, the Mother continues to assert her parental rights by attempting to speak with the Child and working with the Brazilian legal system and all legal avenues to obtain the Child.

### G.   *Brazil was always the intended home for H.E.D.*

56.    The Mother and Father are Haitian citizens who emigrated to Brazil.

57.    H.E.D. was born in Brazil and lived in the Mother and Father's house in Brazil until the Father physically abused the Mother.

12

58.     The Mother and Father always intended for H.E.D. to grow up in Brazil.

59.     The Mother and Father both separately moved to Brazil from Haiti in search of a better life. Brazil is the Mother's home and has been for many years. The Child was born in Brazil and started daycare at four (4) months old. Before she was abducted, the Child was confirmed to be enrolled in school and there remains an available spot for her upon her return to Brazil. For all intents and purposes, Brazil was always intended as the long-term home for H.E.D..

60.     The Mother and Father never discussed moving to Florida and the Mother has no recollection of the Father ever wanting to take the Child to Florida. Even if the Father had requested that, the Mother would not have agreed to let the Father take the Child permanently from her.

## COUNT I – WRONGFUL RETENTION

61.     The Mother restates and re-alleges the allegations contained in Paragraphs 1 through 60 as if fully set forth herein.

62.     The Hague Convention applies to cases where a child under the age of sixteen (16) years has been removed or retained from his or her habitual residence in breach of the rights of custody of a petitioner, which the petitioner had been exercising at the time of the wrongful retention of the child or would have been exercising but for the wrongful retention.

63.     Here, the Child is five years old, *i.e.*, under the age of sixteen.

64.     At the time the Child was abducted by the Father in July 2022, the habitual residence of the Child was Brazil, where the Child was born and lived until her wrongful retention in the United States. The habitual residence is determined at the point in time "immediately before the removal or retention." Convention, art. 3(a). Because the Hague Convention has not defined the expression "habitual residence," courts must "interpret the expression according to the ordinary and natural meaning of the two words it contains" and determine the child's habitual residence "by

reference to all the circumstances of a particular case." *Ovalle v. Perez*, 681 F. App'x 777, 781 (11th Cir. 2017) (quoting *Ruiz v. Tenorio*, 392 F. 3d 1247, 1252 (11th Cir. 2004)).

65.     As stated by the Supreme Court, "[c]ommon sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Monasky v. Taglieri*, 140 S. Ct. 719, 727 (2020). This is such a case, where H.E.D.—before her abduction—only resided in Brazil since her birth in 2019.

66.     In *Ovalle*, the Eleventh Circuit affirmed the district court's decision that the child's habitual residence was in Guatemala based on the following dispositive facts: the child lived in a house in Guatemala with his mother and other family members; the child regularly saw a pediatrician in Guatemala; the child attended church in Guatemala; the father had sent money to Guatemala and visited the child in Guatemala before abducting him; and the father did not follow the procedures of the Hague Convention in seeking to bring the child to Florida, but rather initiated a custody proceeding in the United States and engaged in self-help by abducting the child from Guatemala. *Ovalle*, 681 F. App'x at 783-84. Similarly strong facts are present here: the Child was born in Brazil; lived with the Mother in Brazil; attended medical appointments with nurses and pediatricians in Brazil; and had signed up for daycare classes in Brazil. As a result, it is clear that the habitual residence of the Child is in Brazil.

67.     At the time of the Father's wrongful retention of the Child, the Mother had and continues to have rights of custody with respect to the Child under Brazilian law. Because Brazil was the country of habitual residence of the Child prior to the wrongful retention, the law of Brazil controls "whether custody rights existed at the time of the retention." *In re Cabrera*, 323 F. Supp. 2d 1303, 1311 (S.D. Fla. 2004). Under the Hague Convention, "rights of custody" include "rights relating to the care of the person of the child and, in particular, the right to determine the child's

place of residence." *See* Convention, art. 5(a) (emphasis added). At the time of the Father's wrongful retention of the Child, the Mother had custody of the Child pursuant to Brazilian Court Order. *See* **Exhibit J**. Even without said Court order, the Mother has rights over the Child pursuant to Articles 1,630[3] and 1,634[4] of the Brazilian Civil Code, which Articles provide the parental authority to, among other things, grant or deny the Child permission to travel abroad or to change permanent residence.

68.     The Mother had and continues to have rights of custody with respect to the Child under Brazilian law.

69.     At the time of the Father's wrongful retention of the Child, the Mother was exercising her rights of custody within the meaning of Articles 3 and 5 of the Convention, and continues to do so. Because the Hague Convention does not define "exercise" of custody rights, courts in the Eleventh Circuit have found that "in the absence of a ruling from a court in the country of habitual residence, a court should liberally find 'exercise' where a parent keeps or seeks to keep any sort of regular contact with his or her child." *In re Cabrera*, 323 F. Supp. 2d 1303, 1312 (S.D. Fla. 2004) (citation omitted) (emphasis added). Here, the Mother lived with the Child in the same residence (while in Brazil); has made every effort to stay in regular contact with the Child since her wrongful retention; and has worked diligently to secure the Child's return to Brazil. Thus, the Mother fully exercised her custody rights both when the Child lived in Brazil and during and after the Father's wrongful retention of the Child in the United States.

---

[3] Article 1,630 of the Brazilian Civil Code provides that, "Children are subject to parental authority while they are underage."

[4] Article 1,634 of the Brazilian Civil Code provides that, "Regardless of their relation with each other, both parents have the responsibility of exercise full family authority over their children, which consists in: I – to direct their upbringing and education; . . . IV – to grant or to deny them consent to travel abroad; V – to grant or to deny them consent to change their residence to a different municipality; . . . VIII – reclaim them from those who illegally detain them."

70.     At any rate, a parent "cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1359 (M.D. Fla. 2002) (citation omitted). Here, the Mother is and was fully involved in the Child's life, and there is no indication of abandonment on the part of the Mother.

71.     The Father's retention of H.E.D. in the United States is a breach of the Mother's rights of custody under Brazilian law and is, thus, wrongful.

72.     The Mother has never consented or acquiesced to the retention of the Child in the United States. Contrarily, the Mother relentlessly opposed the Father taking the Child and has persistently notified the authorities of the Father's wrongful abduction and retention of the Child. The Mother has pursued the Child's return to Brazil.

73.     The Mother has promptly taken all legal steps available to her to return the Child to Brazil.

74.     As the country of H.E.D.'s habitual residence, Brazil must make all custody decisions relating to H.E.D. under the Convention and ICARA.

75.     The "central operating feature" of the Convention is a return order. *Abbott*, 560 U.S. at 8. When presented with a wrongful removal or retention, "the country to which the child has been brought must order the return of the child forthwith," absent the applicability of certain narrow exceptions to return. *Id*. None of these narrow exceptions are met here.

76.     Returning the Child to Brazil will not pose a "grave risk" for the Child. *See Friedrich v. Friedrich*, 78 F.3d 1060, 1068  (6th Cir. 1996) ("The person opposing the child's return must show that the risk to the child is grave, not merely serious."). To succeed on a "grave risk" affirmative defense, a parent must prove by clear and convincing evidence that "there is a

grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *See* Convention, art. 13(b); 22 U.S.C. § 9003(e)(2)(A). This is a high burden of proof. Notably, the Father has never alleged any domestic violence, alcohol abuse, recklessness, or endangerment to the Child on the part of the Mother. In fact, the opposite is true here, where the Mother has alleged domestic violence and abuse by the Father against the Mother. Further, the Mother lives in a residential neighborhood with a safe and suitable environment for the Child.

77.     Nor is the "well-settled" exception a bar to return. Under the Hague Convention, if more than one year has passed between the date of the wrongful removal or retention and the date that the petition is filed, then the child shall be returned unless the respondent can demonstrate the child is now settled in the United States. *See* Convention, Art. 12. "[N]othing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof" under the "well-settled" exception. *Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1349 (S.D. Fla. 2002). Determining whether a child has become "settled" is a fact-intensive inquiry that looks at multiple things, including the child's age, the stability and duration of the child's residence in the new environment, whether the child attends school consistently, the stability of the retaining parent's employment and financial circumstances, whether the child has friends or relatives in the new area, whether the child participates in community or extracurricular school activities, the child's immigration status, the respondent's immigration status, whether the child has been concealed in their new location, and the reasons for delay in initiating the petition for the child's return. *See De La Riva v. Soto*, 183 F. Supp. 3d 1182, 1200 (M.D. Fla. 2016). In the present case, the Mother was diligent and filed her Hague Application on May 19, 2023, after securing the assistance of legal counsel. There was no delay on the part of the Mother, but it was

not until August 2023 that the Mother was able to confirm with reasonable certainty that the Father abducted the Child to Florida. Within days of the Father's abduction of the Child, the Mother sought assistance of the local authorities; and shortly after learning that the Father may have left Brazil to go to the United States via Mexico, the Mother sought the assistance of the Federal authorities. Upon information and belief, the Father and Child are in the United States illegally, so any factors that the Child is "well-settled" in Florida are outweighed by the fact that the Father's financial security in the United States is unstable and the Father and Child may be subject to deportation at any time. *See Soto*, 183 F. Supp. 3d at 1201; *Da Silva v. Vieira*, 2020 WL 5652710, at *5 (M.D. Fla. Sept. 23, 2020) ("Being subject to removal at any time contradicts being 'settled' no matter how pleasant their current living situation.").

78.     Moreover, equitable tolling principles are applied to ICARA where the parent has secreted the child from the parent seeking return—like the Father did to the Mother here. *In re Ahumada Cabrera*, 323 F. Supp. 2d 1303, 1313 (S.D. Fla. 2004) ("equitable tolling principles should apply because otherwise parents who abduct and conceal children or more than one year would be rewarded for their misconduct.") (finding the Court will not penalize the petitioner for not immediately filing a petition under the Hague Convention when the petitioner first tried to resolve the situation without resorting to the Hague Convention and when the petitioner was not fully aware of the child's whereabouts).

79.     In conclusion, the Mother is entitled to a return order mandating the return of the Child to her country of habitual residence, Brazil, so that a Brazilian court can make the appropriate and necessary custody determinations in accordance with the laws of Brazil.

## **PROVISIONAL AND EMERGENCY REMEDIES**

80.     Pursuant to ICARA, 22 U.S.C. § 9004, in a proceeding for the return of a child,

#505681840_v4

"[n]o court exercising jurisdiction . . . may. . . order a child removed from a person having physical control of the Child unless the applicable requirements of State law are satisfied." ICARA § 9004(b).

81.    In this case, Florida law applies. Under Florida law, the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") is the source for state statutory law governing, among other things, the resolution of both domestic and international child custody disputes and is codified as Fla. Stat. § 61.501, *et seq*. Florida law addresses the appearance of the parties and the Child in such cases in § 61.523 of the UCCJEA. That section authorizes this Court to order the appearance of the Child and custodian or custodians together. This Court, therefore, has the authority to issue a show cause order, ordering the appearance of the Father and the Child to ensure that the provisions of 22 U.S.C. § 9004 are met. The Mother respectfully requests the Court issue such a Show Cause Order.

82.    The Mother further requests that this Court issue, along with the Show Cause Order: (a) an Order prohibiting the removal of the Child from the jurisdiction of this Court during the pendency of the proceedings in this Court; (b) an Order taking into safe-keeping all of the Child's travel documents; and (c) an Order setting an expedited hearing on the Verified Petition for Return of the Child to Brazil.

## UCCJEA DECLARATION

83.    The details regarding the minor Child that are required to be provided under the UCCJEA are as follows:

84.    Since August 2023, upon information and belief, the Child has been physically located with the Father, as a result of the wrongful retention of the Child. It is believed the Child resides at: 803 Lido Circle, Apt. 101, Lake Park, Florida 33403.

85.     The Mother filed an application for return of the Child under the Hague Convention on May 19, 2023.

86.     The Mother does not know of any person or institution not a party to the proceedings who has physical custody of the Child or claims to have rights of parental responsibility or legal custody or physical custody of, or visitation or parenting time with, the Child.

## NOTICE OF HEARING

87.     Pursuant to ICARA § 9003(c), the Father will be given notice of any hearings in accordance with §§ 61.509 and 61.518 of the UCCJEA.

## ATTORNEY'S FEES AND COSTS INCLUDING TRANSPORTATION EXPENSES PURSUANT TO CONVENTION ARTICLE 26 ICARA § 9007

88.     The Mother has incurred substantial expenses as a result of the wrongful retention of the Child by the Father.

89.     The Mother respectfully requests that this Court award all legal costs, fees, and other expenses the Mother has incurred and will incur to obtain the Child's safe return to Brazil pursuant to Article 26 of the Convention and ICARA § 9007 to the Father.

## RELIEF REQUESTED

**WHEREFORE**, Petitioner, Tercilmene Monera, respectfully requests the following relief:

a)     That this Court issue a Show Cause Order directing the United States Marshals Service or other federal officers to serve this Petition and the below-described Show Cause Order on the Father, and ordering her to appear in this Court to show cause why the Child should not be returned to Brazil for the Brazilian courts to make any and all custody determinations;

b)     That this Court prohibit the removal of the Child from the jurisdiction of this Court pending the resolution of this Petition;

20

c)      That this Court authorize and order the United States Marshals Service to take into safe-keeping the Child's passport and travel documents;

d)      That this Court set an expedited final evidentiary hearing on this Verified Petition for Return of the Child to Brazil and Request for Issuance of Show Cause Order;

e)      That following the final evidentiary hearing, this Court issue an Order directing the prompt return of the Child to her habitual residence of Brazil for the Brazilian courts to make any and all custody determinations in accordance with Articles 3 and 5 of the Convention;

f)      That this Court issue an Order directing the Father to pay the Petitioner's reasonable legal costs, fees, and expenses of effectuating the Child's return to Brazil; and

g)      That this Court grant any such further relief as justice and this cause may require.

Dated: August 7, 2024

Respectfully submitted,

**HOLLAND & KNIGHT LLP**

By:      s/*Suzanne M. Busser*

DAVID IRA SPECTOR  (FBN 0865401)
email: david.spector@hklaw.com
secondary email: kim.roark@hklaw.com
SUZANNE M. BUSSER (FBN 1002654)
email: suzanne.busser@hklaw.com
KYLEE NEERANJAN (FBN 1050749)
email: kylee.neeranjan@hklaw.com
777 S. Flagler Drive, West Tower, Suite 1900
West Palm Beach, Florida  33401
Tel: (561) 833-2000

*Attorneys for Petitioner*

#505681840_v4

## VERIFICATION

I, Tercilmene Monera, do solemnly declare and affirm under the penalties of perjury under the laws of the United States of America and that I have reviewed the factual averments of this *Verified Petition for Return of Child to Brazil and Request for Issuance of Order to Show Cause* and that the factual averments in the foregoing Verified Petition are true and correct.

Tercilmene Monera
_____
Tercilmene Monera

31 de julho 2024
_____
Date

22