UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 24-80958-CIV-CANNON

**TERCILMENE MONERA**
    Petitioner,

v.

**EVENS DATIS**
    Respondent.
_____/

## RESPONSE TO PETITION PETITON
## FOR RETURN OF MINOR CHILD TO BRAZIL

COMES NOW, EVENS DATIS, Respondent herein, by and through the undersigned Counsel and files this his formal response in opposition to the Petitioner's Verified Petition for Return of Minor Child to Brazil. In support thereof, he states as follows:

### DENIALS AND ADMISSIONS

1. The Respondent admits the allegations listed in paragraphs 10, 12, 14, 17,18, 19, 20, 21, 22, 26, 31, 56, 63, 81, 82, 83, 85 and 87 of the Petition.

2. The Respondent partially admits the allegations listed in following paragraphs states:

   - Admits Paragraph to the extent that he took the child from the mother on July 17, 2022. He denies all other allegations listed in that paragraph.

   - Admits Paragraph 8 to the extent that the case falls under the purview of Hague convention and the International Child Abduction Remedies Act ("ICARA"). He denies all other allegations listed in that paragraph,

   - Admits Paragraph 9 to the extent that this court has subject-matter jurisdiction over the case. He denies all other allegations listed in that paragraph.

1

- Admits Paragraph 15 to the extent that the central opening feature of the Convention is a return order. He denies all other allegations listed in that paragraph.

- Admits Paragraph 17 to the extent that the Petitioner must prove her case by a preponderance of the evidence. He denies all other allegations listed in that paragraph.

- Admits Paragraph 23 to the extent that the parties got married in Brazil in 2018. He denies all other allegations listed in that paragraph.

- Admits Paragraph 24 to the extent that the child lived with her mother and father in Sao Paolo Brazil. He denies all other allegations listed in that paragraph.

- Admits Paragraph 31 to the extent that the mother filed a divorce action and that he filed a response thereto. He further admits filing a Police report to alert the police that the mother took the child to live in an extremely dangerous favela in Sao Paolo[1]. He denies all other allegations listed in that paragraph.

---

[1] **Drug Trafficking and Violence**: São Paulo's favelas are often controlled by powerful criminal organizations, such as the Primeiro Comando da Capital (PCC), which are heavily involved in drug trafficking. These groups maintain control through violence and intimidation, creating an environment where violent crime is prevalent.
**Police Violence and Impunity**: Police operations in favelas frequently result in unlawful killings and human rights abuses. Amnesty International has documented systemic police violence, highlighting the lack of accountability and the impunity enjoyed by law enforcement officers. This contributes to a climate of fear and insecurity for residents. The police's aggressive tactics, often justified as necessary against drug traffickers, can lead to collateral damage affecting innocent residents, including children.
**Lack of State Presence**: The Brazilian state's inadequate provision of public services and security in favelas exacerbates the dangers. Police often avoid entering these areas due to the life-threatening risks posed by armed conflicts with criminal groups. This lack of state presence leaves residents vulnerable to the whims of criminal organizations.
**Human Rights Violations**: Reports indicate that police raids in favelas are not only frequent but also deadly, with significant civilian casualties. For example, a police raid in Rio's Jacarezinho favela resulted in twenty-nine deaths, illustrating the extreme measures taken during such operations.

- Admits Paragraph 56 to the extent that he and the Petitioner are Haitian citizens who emigrated to Brazil. He denies all other allegations listed in that paragraph.

- Admits Paragraph 57 to the extent that the child was born in Brazil and lived with in his house with the Petitioner. He denies all other allegations listed in that paragraph.

- Admits Paragraph 59 to the extent he and the Petitioner moved to Brazil in search of a better life that the child was born in Brazil. He denies all other allegations listed in that paragraph.

- Admits Paragraph 62 to the extent that the Hague convention applies to the instant case. He denies all other allegations listed in that paragraph.

- Admits Paragraph 64 to the extent the child's habitual residence is Brazil. He denies all other allegations listed in that paragraph.

- Admits Paragraph 75 to the extent that that the central operating feature of the Convention is a return order. He denies all other allegations listed in that paragraph.

- Admits Paragraph 80 to the extent that this court's action under ICAR must comply with State Law. He denies all other allegations listed in that paragraph.

- Admits Paragraph 83, 84, 85, and 86 to the extent Florida's UCCJEA provisions apply. He denies all other allegations listed in that paragraph.

- The Respondent denies the allegations listed in the following paragraphs, 1, 2, 6, 27, 28, 30, 36, 39, 40, 45, 48, 49, 52, 53, 58, 60, 61, 71, 72, 73, 76, 77, 78, 79, 82, 83, 84, 85, 88 and 89 of the Petition and demands strict proof thereof.

3. Respondent lacks sufficient knowledge to admit or deny the allegations listed in paragraphs 3, 4, 5, 7, 11, 13, 16, 25, 32, 38, 41, 43, 44, 46, 47, 51, 54, 55, 65, 66, 67, 68, 69, 70, 74, and 86. He therefore denies them and demands strict proof thereof.

4. Lastly, Respondent strenuously denies Petitioner's self-serving statements regarding allegations of domestic violence and proceedings thereon in Brazil as he never received any notice of such proceedings and the Petitioner has not presented any final court ruling containing affirmative findings regarding the truth and veracity of the Petitioner's complaints. In fact, further in this response, the Petitioner will show that subsequent to the alleged abuse, he the child and the Respondent partook in several family outings, including a surprise birthday party he threw for her where she was seen smiling and kissing him. The court should reject the said allegations unless the petitioner produces a final Court Order with specific findings affirming her allegations.

## AFFIRMATIVE DEFENSES AND MEMORANDUM OF LAW

**4. For his First Affirmative defense**,

The Respondent would submit that he did not wrongfully detain the child. He was so shocked when he found out that the child had suffered a *broken clavicle* while in the mother's custody that he could not in good conscience return the child to that environment without addressing Petitioner's boyfriend's violent assault on the child. Because he had previously planned to leave Brazil, he had to take her with him. Of significant importance is the Petitioner's sworn statement that the child's shoulder pain was due to a *dislocated clavicle,* which allegedly occurred when Petitioner allegedly pulled the child from her. A bone breakage is not a dislocation. A dislocation involves a shoulder dislocation which occurs when the head of the humerus

4

(the upper arm bone) is displaced from its normal position in the glenoid fossa of the scapula (shoulder blade). A broken clavicle, or clavicle fracture, involves a break in the collarbone, which connects the arm to the body. This is a common injury often resulting from direct trauma to the shoulder, such as falls or contact sports. That definition is consistent with the child's statement to her father that her mother's boyfriend pushed her. The fact that the Petitioner referred to the bone fracture as a mere dislocated clavicle, shows that she did not care to find out why the child complained of pain as soon as she reached him. She took a wild guess because she could not have known with certainty the type of injury the child sustained if in fact it occurred when the Respondent allegedly violently abduct her[2].

6. <u>**Grave risk of Harm to the Child if returned to Brazil**</u>

**For his Second affirmative defense**, the respondent specifically denies ripping the child from her mother as the Petitioner alleged. On July 17, 2022, he went to see the child in a Sao Paolo Favela called IPIRANGA, a dangerous slum infested with drug trafficking and gang violence, where the Petitioner had moved to with the child. When he objected to her moving with the child to such a dangerous place, she began arguing with him about her right to move to wherever she saw fit. Thereupon, the Respondent exited the favela to call the Police, as a crowd started to gather. As he walked out someone in the crowd told her to go out to the main street to deal with the problem. When he reached the Police, they told him that they do not enter these dangerous slums. Shortly thereafter, the Petitioner walked out with the child who ran to him and told him that her shoulder was hurting after her mother's boyfriend, one Marc Elie Baujima, violently pushed her during

---

[2] Both the Respondent and the child will testify that as soon as the child came to him on July 17, 2022, she complained about a severe pain in her shoulder and that the mother's boyfriend pushed her to the ground during an argument with her mother.

an argument with her mother. He admonished the mother and the boyfriend and took the child to see a doctor. Ex rays of the child's shoulder show a *broken clavicle*, not a dislocated clavicle as the mother asserted in the petition. The next day, the Respondent went to several Police divisions and filed the appropriate complaints. **See Composite Exhibit A.**

7. **For his Third Affirmative defense**, the Respondent would submit that his action was necessary because returning the child to the Petitioner posed a grave risk of physical and/or psychological harm to her. The US Supreme Court in Golan v. Saada, de142 S. Ct. 1880 (2022), thoroughly addressed the "grave risk of harm" exception under the Hague Convention and ruled that if returning a child poses a grave risk of physical or psychological harm, the court has discretion to deny the return of the child. The child's physical abuse by the mother's boyfriend clearly and unequivocally confirms that returning her would to the mother would expose her to a grave risk of violent harm, if not death. In Baran v. Beaty, 526 F.3d 1340 (11th Cir. 2008), the 11th Circuit held that the "grave risk" exception applies if there is clear and convincing evidence that returning the child would expose her to harm. The child's broken clavicle, while in the custody of the mother, unequivocally shows that she was unwilling or unable to protect the child from her boyfriend. Her negligence and recklessness are the sole causes of the child's injuries. Her allegations that the child's shoulder was dislocated when she was violently pulled from her by the Petitioner, ring hollow, primarily because if that truly occurred, as stated above, she would not have known the specific diagnosis absent medical confirmation because the Respondent, not her, took the child to the hospital that same day.

8.   **Child is well settled in the United States**

**For his Fourth Affirmative defense**, the Respondent would submit that but for the child's exiting Brazil and arriving in the United States on January 5, 2023, she would have continued to suffer violence at the hand of her mother's boyfriend because her mother could not and will not control him. The child has continuously resided with him since entering the US and currently attends the *Conservatory school,* following her graduation from *Kidz Academy*. She attends Summer Camp during summer breaks and attends church with Respondent's family when he is scheduled to work. In addition, she is covered by health insurance, has an attending pediatric physician, and has received all State required Immunizations. By all accounts, the child is well settled in the US both under Hague Convention tenets and US legal precedents. **See Composite exhibit B**.

9.   Because neither the Convention nor ICARA defines the term 'settled' or provides any guidance on the factors courts should consider when determining whether a child is settled, the court in *Figueredo v. Rojas, 99 F.4th 1344, 1350 (11th Cir. 2024)* declared in no uncertain terms that in the 11th Circuit, a child is "settled" for purposes of the Convention "when a preponderance of the evidence shows that the child has significant connections to their new home that indicate that the child has developed a stable, permanent, and non-transitory life in their new country to such a degree that return would be to the child's detriment." *Id. at 361. Figueredo* quoting *Fernandez v. Bailey, 909 F.3d 353, 363 (11th Cir. 2018)* The court went on to explain that:

> In making this determination, courts must "carefully consider the totality of the circumstances," including

> evidence of the child's "significant connections to the new country" as well as evidence of continuing "contacts with and ties to his or her State of habitual residence." Id. (quoting State Dep't Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (March 26, 1986)) id at 1351

As stated above, the child has been in the United States for twenty months and is living in a safe and non-transitory environment where her social, medical, and psychological needs are being met. Uprooting her and returning her to an irresponsible mother would reinsert her back into a violent slum, practically abandoned by the authorities, which would expose her to more harm, if not death.

10. The *Fernandez* decision further articulated a standard, albeit in *dicta,* which should guide this court in ruling on the Petition. The court opined that "We do not suggest that district courts should regularly return a child under the Convention despite a finding of settlement in a new environment. To the contrary, a district court ordering the *return of a settled child should be an infrequent occurrence*, so as not to swallow the text of Article 12's stated exception. *Id at 363.* In that case, the 11th Circuit found that a child was considered to be "settled" in his/her new environment after living in the same home and steadily attending Palm Beach County schools for close two years, a situation practically identical to ours. Lastly, the US Supreme Court previously addressed that very issue, conclusively finding that: "Article 13(b) allows a court to refrain from ordering a child's return to her habitual residence if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Art. 13(b), Treaty Doc., at 10". Monasky v. Taglieri, 140 S. Ct. 719, 720 (2020). Although *Monasky* primarily addressed the steps to follow in determining a child's habitual residence, it also highlighted the importance of considering the

child's integration into her environment. The child's life in the US since entering in January of 2023 confirms beyond any doubt that she is fully integrated in the Palm Beach County Community.

11. **<u>Petitioner and minor child not subject to immediate removal</u>**

**For his Fifth Affirmative Defense**, the Petitioner would submit that neither he nor the child is subject to deportation at any time, as alleged by the Petitioner. That position has no basis in law or fact. Specifically, both he and the child, who is five years of age, are *Prima Facie* eligible *Temporary Protective Status* in the US.[3] They both applied for TPS as soon as the Government announced a new designation for Haiti[4]. The minor child's Application was recently approved. **See Composite Exhibit C.** Temporary Protected Status *(TPS)* is a humanitarian program that allows nationals from designated countries to live and work in the United States temporarily due to unsafe conditions in their home countries. TPS beneficiaries are shielded from deportation and are eligible for work authorization. As TPS recipients, the father and child are protected from removal from the U.S.

12. The Petitioner's contention that they may be deported at any moment is without merits and ought to be summarily rejected. The 11th circuit in Figueredo, *supra*, also addressed the TPS issue. Assuming arguendo that they were not eligible for TPS, that factor is one of

---

[3] Temporary Protected Status (TPS) for Haiti has been extended and redesignated until February 3, 2026. This extension allows current beneficiaries to retain their TPS status if they continue to meet the eligibility requirements. The Department of Homeland Security (DHS) announced this extension and redesignation on June 28, 2024, due to ongoing extraordinary and temporary conditions in Haiti, such as violence, insecurity, and natural disasters. The father and child's TPS status provides significant legal protection against removal and supports their argument against being classified as undocumented aliens.

[4] In fact, the Biden Administration has announced an extension and redesignation of Temporary Protected Status (TPS) for Haitians, effective from August 4, 2024, through February 3, 2026. This decision allows approximately 309,000 Haitian nationals already residing in the United States as of June 3, 2024, to apply for TPS.

several factors the court must examine when ruling on the Petition. In affirming a "well-settled" finding by the lower court, the *Rojas* court concluded that "in making its finding that C.R. was settled in Florida, the district court considered his *uncertain immigration status* as one factor but noted—without making any judgment on the merits of Rojas's immigration case—"…that Rojas had been granted authorization to remain and work in the United States while the asylum petition remained pending. This meant that Rojas and C.R. *probably would not be removed from the United States for at least another year* even if Rojas's application for asylum were eventually denied" id at 1349.

13. The Petitioner and minor child cannot be considered undocumented aliens as suggested by the Petitioner. The new TPS designation refutes the Petitioner's contention and strengthens the Respondent's position that the child is well-settled in her new environment. The "well-settled" defense under the Hague Convention allows for the retention of a child if the court finds that she became settled in the US. Given the child's nearly two-year residency in the U.S., her integration into the community and her schools, she is unequivocally well settled in the US. In addition, the Petitioner's gainful employment in the US further bolsters their "well-settled" claim. **See Exhibit D**.

14. **Equitable Tolling not applicable**

**For his Sixth affirmative defense,** the Respondent would submit that *Equitable Tolling* under ICARA does not apply to the case at bar. The mother alleges that equitable tolling under the International Child Abduction Remedies Act (ICARA) should apply because the father allegedly secreted the child away. The U.S. Supreme Court in <u>Lozano v. Montoya Alvarez, 572 U. S. 1, 134 S.Ct. 1224, 188 L. Ed. 2d 200 (2014)</u>, specifically rejected that argument and

concluded that the one-year period for filing a petition under the Hague Convention is not subject to equitable tolling even if the father allegedly secreted the child away. He will again submit that he did not secret the child away. He just took her with him as he departed from Brazil because he feared leaving the child in Brazil would subject her to abuse again. The Court further found that tolling of the one-year period is not automatically granted under the Hague Convention and emphasized the importance of adhering to the text of the Hague Convention and the International Child Abduction Remedies Act (ICARA),as the Convention's drafters did not include a provision for *Equitable tolling*, The drafters, it continued, intended to make the one-year period very strict. This court should follow the US Supreme Court's binding opinion, rather than the local District Court's opinion of in <u>In re Ahumada Cabrera, 323 F. Supp. 2d, 1303, 1313 (S.D. Fla. 2004)</u>, the case cited by the Petitioner in support of her Equitable tolling Argument.

15. Even sans the *Lozano* opinion, the Petitioner's reliance on Equitable Tolling totally misses the mark because on the one hand she alleged that the Respondent violently abducted the child from her on July 17, 2022. On the other hand, she admitted waiting until August 2023, more than a year later, to take action. Worst yet, she waited an additional five months thereafter before filing the Petition for return because, as she alleges "…it was not until August 2023 that…" she "… was able to confirm with reasonable certainty that the father abducted the child to Florida". When she filed the instant petition, the child had been in the US for more than one year. It is evident that she did not tell Brazilian authorities that the father had abducted the child on July 17, 2024, because had she done so on July 17, 2022, they would have referred her to the "Public Defender's Office of the Union" to initiate a judicial Assistance

Process and the "Department of Asset Recovery and International Legal Cooperation" for assistance with initiating a return petition, the way they did in August of 2023

16. **Petitioner is not credible**

The Petitioner accuses the Respondent of inflicting domestic violence upon her by the Respondent beginning in July of 2021. However, the exhibits to be introduced at the Merits hearing include several pictures and videos from a surprise birthday Party Respondent threw for her in September 2021. The exhibits also include a plethora of date-stamped pictures showing the Petitioner, the Respondent, and the child in amusement parks through the end of 2022[5]. The abuse allegations are completely false and clearly concocted as a ploy to bolster an otherwise weak petition. **See Composite Exhibit F.**

17. **Due Process violation**

Petitioner's introduction of allegations she made to Brazilian authorities violates the Respondent's rights to due process because, as stated above, while in Brazil, he has never personally served with any petitions alleging the alleged domestic violence and no Brazilian court has issued any rulings thereon. It is well settled that Due process rights are protected under the Hague Convention. While the Convention aims to return children to their habitual residence, exceptions exist when due process is not observed. This is quite relevant because the father was not given a fair opportunity to address the domestic violence allegations in Brazil. Using these allegations in US proceedings without prior adjudication in Brazil, undermines his due process rights. Dorothy C. Daigle, *Due Process Rights of Parents and Children in International Child Abductions*, 26 Vanderbilt Law Review 865 (2021), Section IV.A.

---

[5] The actual Videos will be transferred to CD-ROM or DVD for filing with the court under composite Exhibit E.

WHEREFORE, for the foregoing reasons, Petitioner EVENS DATIS respectfully requests that this Honorable Court deny all relief sought in the Plaintiff's Petition, and grant any other relief deemed appropriate.

Respectfully Submitted!

Dated: September 20, 2024

**BRUTUS LAW GROUP, PA**
301 W. Atlantic Avenue, Suite 0-8
Delray Beach, Florida 33444
Email: info@brutuslawgroup.com
Telephone: (561) 526-8383
Facsimile: (561) 526-8315

By: _____
Phillip J. Brutus, Esquire
Attorney for Respondent
Florida Bar Number: 660711