UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 24-80958-CIV-CANNON

**TERCILMENE MONERA,**

    Petitioner,

v.

**EVENS DATIS,**

    Respondent.
_____/

## ORDER GRANTING PETITION FOR RETURN OF MINOR CHILD

**THIS CAUSE** comes before the Court upon Petitioner's Verified Petition for Return of Minor Child to Brazil ("Petition"), filed on August 7, 2024 [ECF No. 1]. The Court has carefully considered the Petition and accompanying Exhibits [ECF Nos. 1, 25, 30–31], Respondent's Answers and accompanying Exhibits [ECF Nos. 32–33, 55], the Parties' Joint Pre-Trial Stipulation [ECF No. 124], Petitioner's Proposed Findings of Facts and Proposed Conclusions of Law [ECF No. 125], Respondent's Proposed Findings of Facts and Proposed Conclusions of Law [ECF No. 117], Petitioner's depositions [ECF Nos. 91, 116], and the evidence presented over the course of an evidentiary hearing [ECF Nos. 134–136].[1] For the reasons discussed forth below, the Petition is **GRANTED**.[2]

---

[1] A transcript of this hearing is not on the docket but corresponds to the Evidentiary Hearing on May 21, 2025, and will be cited using the following convention: "Tr. __." [ECF No. 134].

[2] The Petition also requested an Order to Show Cause, which was granted and issued by earlier Order [ECF Nos. 1, 17].

## INTRODUCTION

On August 7, 2024, Petitioner Tercilmene Monera ("Petitioner") filed a Verified Petition pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11 (the "Hague Convention"), as implemented by the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.* ("ICARA") [ECF No. 1]. Petitioner alleges that Respondent has wrongfully retained their now six-year-old daughter ("H.E.D.") since August 2022 and seeks her immediate return to Brazil [ECF No. 1 p. 1]. Respondent opposes the return order, arguing that three exceptions under the Hague Convention apply: a grave risk of harm awaits H.E.D. if she were to return to Brazil; she is well settled in Florida after living here for almost three years; and Petitioner acquiesced to H.E.D.'s removal to the United States by delaying in filing this action [ECF Nos. 32, 55, 117, 124]. Following a careful examination of all record evidence in accordance with the Federal Rules of Evidence and the Court's evidentiary rulings, along with the parties' arguments, the Court finds that the Hague Convention and ICARA requires H.E.D.'s immediate return to Brazil.

## THE HAGUE CONVENTION

The Hague Convention, to which Brazil and the United States are signatories, "applies to children under sixteen years of age who are 'habitually resident' in a contracting state (Convention, Art. 4) and are 'wrongfully removed' to another contracting state (Convention, Art. 1)." *Seaman v. Peterson*, 766 F.3d 1252, 1257 (11th Cir. 2014).[3] Pursuant to the Convention,

> [a] child is 'wrongfully removed' when (a) the removal 'is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident,' and (b) at the time of removal the rights of custody 'were actually exercised' by the person having those rights (Convention, Art. 3). The term

---

[3] The International Child Abduction Remedies Act (ICARA), 102 Stat. 437, as amended, 22 U.S.C. § 9001, implements the United States' obligations under the Hague Convention. *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020).

> 'rights of custody' includes 'rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence' (Convention, Art. 5).

*Id*.

Under this framework, to make a prima facie case of improper removal, Petitioner must prove by a preponderance of the evidence that (1) H.E.D. was habitually resident in Brazil at the time Respondent retained her in the United States; (2) the retention was without Petitioner's consent and constituted a wrongful breach of her custody rights under Brazilian law; and (3) Petitioner was actually exercising her custody rights at the time of the retention. *Calixto v. Lesmes*, 909 F.3d 1079, 1083 (11th Cir. 2018); 22 U.S.C. § 9003(e)(1)(A).

If Petitioner establishes a prima facie case of improper removal, H.E.D must be returned to Brazil "forthwith" unless Respondent establishes that one of the exceptions to the Hague Convention applies. *Golan v. Saada*, 596 U.S. 666, 672 (2022) (citing § 9003(e)(2)). These exceptions include (1) the person requesting return was not, at the time of the retention or removal, actually exercising custody rights, or had consented to, or subsequently acquiesced in, the removal or retention; (2) the return would result in grave risk of physical or psychological harm to the child; (3) the child's return "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms"; and (4) the return proceedings commenced more than one year after the abduction and the child has become settled in the new environment. *See In re Leslie,* 377 F. Supp. 2d 1232, 1238 (S.D. Fla. 2005); *see also Seaman*, 766 F.3d at 1257 (discussing the grave-risk and well-settled exceptions).

The Hague Convention's exceptions are to be construed narrowly and must be proven by a preponderance of the evidence, *Gomez v. Fuenmayor*, 812 F.3d 1005, 1011 (11th Cir. 2016), but a respondent "bears the burden of establishing the grave risk exception by clear and convincing

evidence," *Baran v. Beaty*, 526 F.3d 1340, 1345 (11th Cir. 2008); *see* 22 U.S.C. § 9003(e)(2)(A). "Even if an exception is established, the Court has discretion to order the return of a child if return would further the aims of the Hague Convention." *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1358 (M.D. Fla. 2002) (citing cases); *see also Fernandez v. Bailey*, 909 F.3d 353, 363 (11th Cir. 2018).

## FINDINGS OF FACT

The Court heard testimony from the following witnesses during the evidentiary hearing: (1) Tercilmene Monera (Petitioner); (2) Evens Datis (Respondent); and (3) Yodlie Noel (Respondent's partner). The Court also considered the depositions of Adrianna Pires Gentil Negrao (Brazilian counsel for Petitioner), Carla Viana (Brazilian counsel for Petitioner), and Roland St. Ivers (Petitioner's brother-in-law) [ECF No. 98; *see* ECF No. 74]. Additionally, the Court admitted into evidence many exhibits consisting of, among other things: Brazilian court records, H.E.D.'s school and medical records, and immigration documentation [ECF Nos. 135–136].

After considering testimony and evidence from the parties, the Court finds the following facts.

1. Petitioner and Respondent—both Haitian citizens who moved to Brazil—married in August 2018 [ECF No. 124 ¶¶ 3–5].

2. H.E.D. was born in January 2019 in São Paulo, Brazil. H.E.D. is a Brazilian citizen [ECF No. 124 ¶¶ 6–10]. Petitioner and Respondent are H.E.D.'s biological parents.

3. When H.E.D. was born, Petitioner and Respondent lived in the same house [ECF No. 124 ¶ 13]. In September 2019, when H.E.D. was less than one-year-old, Petitioner and

    Respondent moved into separate homes [ECF No. 124 ¶ 15].[4] Petitioner and H.E.D. lived together and Respondent would visit H.E.D. by coordinating with Petitioner on a case-by-case basis; no formal custody agreement was in place [ECF No. 124 ¶¶ 15–17].

4. Petitioner was H.E.D.'s primary caretaker while she resided in Brazil [ECF No. 124 ¶18].

5. In July 2021, Petitioner filed for divorce and full custody in Brazil against Respondent [ECF No. 124 ¶ 17; ECF No. 136-4 (Petitioner's Divorce Petition)].

6. In April 2022, Respondent requested to spend the Easter Holiday with H.E.D. A three-day visit was arranged between H.E.D. and Respondent. Tr. 31. Petitioner credibly testified that Respondent refused to return H.E.D. after the three days. As a result, Petitioner and Respondent got into a verbal altercation, ultimately leading Petitioner to obtain a police escort to retrieve H.E.D. from Respondent's home. Tr. 33.

7. After the Easter incident, on April 20, 2022, Petitioner obtained a provisional custody order under Brazil's Maria da Penha Law[5] and an ex parte restraining order preventing Respondent from coming within 500 meters of Petitioner or contacting her in any way [ECF No. 124 ¶ 21; ECF No. 136-5 (Court Order)].[6]

---

[4] The parties dispute the particular basis for their separation; Petitioner accuses Respondent of domestic violence against her during various points in their relationship [*e.g.*, Tr. 19, 69], while Respondent disagrees and objects to consideration of such evidence [*e.g.*, Tr. 23–25]. The Court need not resolve this factual dispute to resolve the Petition in this case, as nothing in Petitioner's claim or Respondent's affirmative defenses hinges on the outcome of Petitioner's claims of domestic abuse as to her. Nor does the Court base its determination on such allegations.

[5] The Maria da Penha Law sets forth legal remedies and mechanisms for domestic and family violence. Lei No. 11.340, 7 de Agosto de 2006, Diário Oficial da União, 22 de Setembro de 2006.

[6] As previously determined, the Court takes judicial notice of the existence of the Brazilian Court Orders in this case for the limited purpose of recognizing the particular judicial or government act [ECF No. 131 p. 5].

8. On July 17, 2022, while the restraining order was still in effect, Respondent attempted to visit H.E.D. at the home of Petitioner's then-boyfriend "Marc Elie," where Petitioner was living with H.E.D. Petitioner refused to grant Respondent access to H.E.D. [ECF No. 124 ¶ 22]. Concerned by Respondent's conduct, Petitioner decided to go to a government office in her neighborhood to file a complaint. Tr. 46. As Petitioner was walking to the government office with H.E.D. and her boyfriend, Respondent suddenly appeared on the street and proceeded to grab H.E.D. from Petitioner's hands; Petitioner tried to hold onto the child in an attempt to prevent Respondent from taking H.E.D. Tr. 45. Respondent ultimately overpowered Petitioner and forcibly took H.E.D. from Petitioner's custody [ECF No. 124 ¶ 23]. Tr. 45–47.

9. At some point during this period, H.E.D. sustained an injury to her clavicle as documented in a medical report dated July 17, 2022, the date of the removal [ECF No. 135-6]. Respondent suggests, without any reliable corroboration, that Petitioner's then-boyfriend, "Mark Elie," physically abused H.E.D. Petitioner counters by describing as fake and unsupported Respondent's claims of abuse [*see* Tr. 37, 47]. Upon full consideration, the Court finds insufficient evidence in this proceeding to support a finding of fact as to the cause of the injury or Respondent's assertions of physical abuse toward H.E.D.

10. Petitioner did not consent to Respondent's removal of H.E.D. from Brazil.

11. Immediately following Respondent's taking of H.E.D. from Petitioner, Petitioner sought assistance locating H.E.D. from local Brazilian authorities. Tr. 47, 50 (Petitioner describing calls to police and visit to local government office immediately after Respondent took H.E.D.).

6

12. In August 2022, a court in Brazil concluded that Petitioner was exercising custody of H.E.D. when she was taken by Respondent, granted provisional custody to Petitioner, and ordered Respondent to return H.E.D. to Petitioner within 48 hours [ECF No. 124 ¶ 26; ECF No. 136-6 (Court Order)]. In August 2022, the Brazilian Court also granted Petitioner's request for search and seizure of Respondent's home in furtherance of returning the Child [ECF No. 136-6 (Court Writ for search and seizure)]. The search was conducted in November 2022, but Respondent had already left Brazil by that time [ECF No. 91-2].[7]

13. It is undisputed that Respondent removed H.E.D. from Brazil on August 16, 2022 [ECF No. 124 ¶ 38].

14. On January 5, 2023, following a nearly five-month bus journey through nine countries, Respondent and H.E.D. arrived in the United States.[8] Respondent filed for Temporary Protective Status ("TPS") for himself and H.E.D. as Haitian nationals [ECF No. 124 ¶ 56]. Respondent was granted TPS status in October 2024; H.E.D was granted TPS status in September 2024 [ECF No. 124 ¶¶ 57–58; Tr. 116, 130–131].[9]

---

[7] Petitioner credibly testified that when she was accompanied by the police to Respondent's home in Paulinia, Brazil, to conduct the search and seizure, the new resident of the home informed her that Respondent had left the country and "probably went to Mexico or somewhere else." Tr. 56. *See also* ECF No. 136-10 (process server attesting that Respondent was no longer in Paulinia as of November 9, 2022, and that he contacted Respondent via phone with no response).

[8] To reach the United States, Respondent traveled by bus through Bolivia, Peru, Ecuador, Colombia, Panama, Costa Rica, Nicaragua, Honduras, Mexico [ECF No. 124 p. 10; Tr. 97, 139–142].

[9] The Court notes that H.E.D. is not a Haitian national. She is a citizen of Brazil [ECF No. 136-1]. Tr. 12.

15. The Court takes judicial notice that the TPS Program under which Respondent and H.E.D. were granted temporary citizenship is set to expire on August 3, 2025 [ECF No. 122-1 (Department of Homeland Security's announcement that TPS designation for Haitian nationals will expire on August 3, 2025); ECF No. 131]. Respondent indicated at the Hearing that he and H.E.D. have pending political asylum applications. Tr. 117.

16. From August 2022 to December 2022, Petitioner engaged in consistent efforts to locate H.E.D., including but not limited to contacting the Brazilian prosecutor's office, seeking support from the Guardia Maria da Penha program, contacting local police and the Brazilian child protective counsel, as well as working with counsel in Brazil, Carla Vianna and Francisca Franca [ECF No. 124 ¶¶ 28–31; ECF No. 91-2 pp. 13–23]. As noted above, during this time, Respondent was traveling through multiple countries by bus with H.E.D. en route to the United States.

17. In March 2023, while still engaged in efforts to locate H.E.D., Petitioner started working with a public defender's office in Brazil. Through those efforts, in August 2023, Petitioner's Brazilian counsel conducted a social media investigation of Respondent and determined that he and H.E.D. likely were residing in West Palm Beach, Florida. Even at that point, however, Respondent's social media was "tagging" from various locations in the United States—impeding Petitioner's ability to discern his actual residence [ECF No. 91-2 pp. 17–21, 30; ECF No. 1 ¶ 47].

18. Petitioner ultimately retained different Brazilian counsel in February 2024 [ECF No. 91-2 p. 34], pro bono counsel in the United States, and initiated this action on August 7, 2024 [ECF No. 124 ¶¶ 31, 37].

19. Petitioner has not been able to see or contact her daughter since Respondent forcibly took H.E.D. from her arms in Brazil on July 17, 2022. Tr. 57. Petitioner attempted to reach Respondent by phone three times and each time she tracked down his phone number, he changed it. Tr. 57.

**CONCLUSIONS OF LAW**

**I.     Petitioner Has Established a Prima Facie Case Under the Hague Convention**

To establish a prima facie case under the Hague Convention, Petitioner must establish, by a preponderance of the evidence, that (1) H.E.D. was a habitual resident of Brazil at the time of her retention in the United States; (2) Respondent's retention of H.E.D. in the United States violated Petitioner's rights of custody under Brazilian law; and (3) Petitioner was exercising her rights of custody at the time of the wrongful retention. *See Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1358 (11th Cir. 2020); *see also* 22 U.S.C. § 9003(e)(1).

**a.     H.E.D. was a Habitual Resident of Brazil at the Time of Retention**

Respondent concedes that H.E.D.'s habitual residence was Brazil at the time Respondent removed H.E.D. from Brazil [ECF No. 32 p. 3; ECF No. 124 p. 13, ¶ 3]. Tr. 166 ("The child's habitual residence is in Brazil. We don't dispute that."). There is no dispute that Respondent removed H.E.D. from Brazil on August 16, 2022.

**b.     Respondent's Retention of H.E.D. Violated Petitioner's Custody Rights**

Having determined that Respondent removed H.E.D. from her country of habitual residence (Brazil), the Court next evaluates whether Petitioner has shown by a preponderance of the evidence that the retention was wrongful within the meaning of the Hague Convention. "A removal or retention is "wrongful" in this context if it is in breach of rights of custody attributed to a person, . . . either jointly or alone, under the law of the State in which the child was habitually

resident immediately before the removal or retention . . . ." *Berenguela-Alvarado*, 950 F.3d at 1358.

Petitioner argues that Respondent's taking of H.E.D. violated Petitioner's custody rights under Brazilian law because she had sole, provisional custody of H.E.D. as granted to her by the Brazilian Court, and that at the very least, she had joint custody of H.E.D., including her pre-existing *ne exeat* right under Article 1,634 of the Brazilian Civil Code to prohibit her child from traveling to another country absent her consent [ECF No. 125 pp. 11–12].[10]

Although Respondent raises procedural challenges to Petitioner's assertion of sole custody, he agrees at a minimum that Petitioner had joint custody and *ne exeat* rights under Brazilian law at the time of removal. This understanding is documented in the evidentiary record as reflected in the Factual Findings above. *Supra* pp. 5–6. And it is sufficient to establish that Respondent's removal of H.E.D. from Brazil—without Petitioner's consent—violated Petitioner's *ne exeat* rights and presumptive joint custody rights under Brazilian law [ECF No. 124 p. 5; Tr. 167 (Respondent's counsel admitting that Petitioner had joint custody at the very least)]. *See* Lei. No. 10,406, art. 1634 (Br.) (providing both parents "full exercise of parental authority . . . [including] to grant or deny them consent to travel abroad"); ECF No. 91-1 p. 25 (Brazilian counsel testifying about *ne exeat* rights under Brazilian law). The removal was therefore wrongful within the meaning of the Hague Convention. No further discussion of this prima facie element is necessary.[11]

---

[10] A *ne exeat* right is "the authority to consent before the other parent may take the child to another country." *Abbott v. Abbott*, 560 U.S. 1, 5 (2010). Under Brazilian law, this right is codified in Section 1,634 of the Civil Code. Lei. No. 10,406, art. 1634 (Br.).

[11] Respondent focuses his attention on the procedural adequacy of Petitioner's grant of provisional custody under Brazil's Maria da Penha Law, arguing that the April 2022 Brazilian Court order was issued on an ex parte basis, without due process, and in violation of service requirements under

### c. Petitioner was Exercising Custody Rights at the Time of Retention

Petitioner was clearly exercising her custody rights at the time of Respondent's wrongful removal. Although the Hague Convention does not define "exercise," courts have liberally found that a parent has exercised custody rights where he or she "keeps or seeks to keep any sort of regular contact with his or her child." *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996).

As credibly testified by Petitioner during the Hearing, and as acknowledged by Respondent [ECF No. 124 p. 8] and reinforced by the testimony of Petitioner's Brazilian Counsel [ECF No. 91-1 p. 71], Petitioner has been H.E.D.'s primary caregiver since her birth in January 2019. Tr. 22, 26–28. Petitioner was living with and regularly caring for H.E.D. at the time Respondent came to their home and absconded with the Child. Tr. 20–24, 27. Further, the record is replete with evidence that Petitioner meaningfully exercised her custody rights, including by contacting law enforcement when Respondent did not return H.E.D. after his three-day visit in April 2022. Tr. 31–33. Respondent offers no basis to dispute Petitioner's exercise of custody rights.

Petitioner has established a prima facie case of improper removal under the Convention.

### II. Respondent Has Not Established That an Exception to the Convention Applies

#### a. Well-Settled Exception

Respondent argues that H.E.D. is well settled and integrated in Florida, citing her enrollment in school and receipt of basic medical care [ECF No. 32 p. 7; ECF No. 55 p. 6; ECF No. 117 p. 3]. Petitioner opposes application of the narrow well-settled exception, noting H.E.D.'s

---

Article 15 of the Hague Service Convention [ECF No. 124 p. 4]. Even if the Court were in a position in this proceeding to address Respondent's challenge to a foreign court order—which it is not, *see Monasky*, 589 U.S. at 72 (citing Convention Preamble)—Respondent's dispute does not alter the baseline conclusion that both parents had *at least* joint custody of H.E.D. sufficient to satisfy Petitioner's prima facie showing of custody under the Hague Convention.

very young age, uncertain immigration status, and overall lack of significant connections to the United States [ECF No. 125 pp. 13–16].

Under the Hague Convention, the Court may decide not to issue a return order if the proceedings were commenced more than one year after the wrongful retention and the Respondent demonstrates by a preponderance of the evidence "that the child is now settled in its new environment." Art. 12. The Eleventh Circuit has determined that "a child is settled within the meaning of ICARA and the Convention when a preponderance of the evidence shows that the child has significant connections to their new home that indicate that the child has developed a stable, permanent, and nontransitory life in their new country to such a degree that return would be to the child's detriment." *Fernandez*, 909 F.3d at 361. Even if the Child is well settled, the Court may also consider "the child's need for contact with the non-abducting parent, who was exercising custody when the abduction occurred; the non-abducting parent's interest in exercising the custody to which he or she is legally entitled; the need to discourage inequitable conduct (such as concealment) by abducting parents; and the need to deter international abductions generally." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 21 (2014) (Alito, J. concurring); *see Fernandez*, 909 F.3d at 362–364 (permitting discretionary consideration of the aims of the Convention despite a finding that minor is well-settled).

Respondent is permitted to assert the well-settled exception given that H.E.D. was taken from Petitioner on July 17, 2022 [ECF No. 124 ¶ 23] and this proceeding commenced on August 7, 2024 [ECF No. 1]. But Respondent has failed to demonstrate by a preponderance of the evidence that H.E.D. is well settled in Florida or in the United States more generally. The only evidence offered by Respondent on this point consists of school records that confirm her attendance at two Florida schools; medical records reflecting vaccinations and other required

medical care since arriving in the United States; and general testimony from Respondent's female partner that she looks after H.E.D. in the home they jointly occupy with other individuals [ECF No. 135-7; ECF No. 135-10; Tr. 143–147]. Without more, Respondent has not established a "stable, permanent, and nontransitory life" for H.E.D. sufficient to clear the well-settled threshold. *See Fernandez*, 909 F.3d at 361. Most importantly, H.E.D. is only six years old and has spent only a few years of her very early childhood in Florida—just as many as she spent in Brazil prior to Respondent's wrongful retention in August 2022. Further, although not dispositive, neither Respondent nor H.E.D. has secure legal status in this country; the TPS program under which they temporarily remain in the United States is set to expire on August 3, 2025 [ECF No. 122-1 (Department of Homeland Security's announcement that TPS designation for Haitian nationals will expire on August 3, 2025)]. And although Respondent referenced an asylum application at the Hearing [Tr. 176], that application remains pending, with no substantiation of permanent legal status or citizenship. *See In re Ahumada Cabrera*, 323 F. Supp. 2d 1303, 1314 (S.D. Fla. 2004) (suggesting that "uncertain immigration status of a parent" is one of many factors within the well-settled inquiry).

For these reasons, the record does not support a conclusion that H.E.D. has the requisite substantial meaningful connections in the United States to permit a finding that she is well settled within the meaning of the Hague Convention. *See Fernandez*, 909 F.3d at 361 (noting that the well-settled exception is to be construed narrowly). And, even if a case were to be made that H.E.D. has reached some tenuous degree of stability in the United States, the various other considerations underpinning the Convention counsel strongly in favor of a return order. *Id.* at 362–363. Among other factors, H.E.D. has not been able to see her mother since Respondent took her from Brazil at the tender age of 3; Petitioner has demonstrated a clear desire to exercise her

custody rights to which she is legally entitled; and the record reflects that Respondent has engaged in a consistent effort to prevent contact between H.E.D. and Petitioner since the taking.

### b. Consent/Acquiescence

Respondent next argues, for the first time in his Proposed Findings of Fact and Conclusions of Law, that Petitioner's "twenty-five-month delay" in filing this Petition implies acquiescence to Respondent's continued retention of H.E.D. in the United States [Tr. 178; *see* ECF No. 117 p. 3]. Respondent measures this period from the date of the taking in Brazil, July 17, 2022, to the date Petitioner initiated this action on August 7, 2024 [ECF No. 1]. In Opposition, Petitioner objects to this defense as untimely [ECF No. 125 p. 9; *see* ECF Nos. 32, 55 (Respondent's Answers)]. Petitioner also argues that Respondent failed to provide any evidence of acquiescence; that Petitioner has engaged in consistent efforts to obtain the return of her child after Respondent's wrongful removal; and that any delays in initiating this action were not due to actions by Petitioner [ECF No. 125 p. 9].

Under Article 13(a) of the Hague Convention, a court may decide not to issue a return order if the respondent demonstrates by a preponderance of the evidence that the person "having the care of the person of the child . . . consented to or subsequently acquiesced in the removal or retention." Art. 13(a); 22 U.S.C. § 9003(e)(2)(B). "[A]cquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d at 1065. "The focus of the court's inquiry should be on the petitioning parent's 'subjective intent' and should take into account '[t]he nature and scope of the petitioner's consent, and any conditions or limitations' on that consent." *Id.*

14

As a preliminary matter, Respondent failed to plead this defense in either his initial or Amended Answer [ECF Nos. 32, 55]—electing to wait until a pre-trial filing a week before trial to introduce this theory into this case [ECF No. 117].  Respondent provides no justification for this waiver; nor does the record reveal any impediment to the raising of defenses.  For this reason, the Court deems this defense waived.  *See Latimer v. Roaring Toyz, Inc*., 601 F.3d 1224, 1240 (11th Cir. 2010) (citing Fed. R. Civ. P. 8(c) and noting that failure to plead an affirmative defense generally results in a waiver of that defense).

Even assuming this untimely defense were properly before the Court, the Court agrees with Petitioner that Respondent has presented insufficient evidence to suggest that Petitioner consented or acquiesced to H.E.D.'s removal or retention.  To begin, there is no record support for the notion that Petitioner agreed to Respondent's unlawful taking of H.E.D. in July 2022 [*see* Tr. 178–179 (The Court: "In July of 2022, do you have any evidence to suggest that the mother was okay with the father taking the child from her custody?" Respondent: "I can't say I have evidence of that."). Quite the contrary, Respondent literally ambushed Petitioner and yanked H.E.D. from Petitioner's physical custody in a public street after Petitioner denied him access to H.E.D. against the backdrop of a temporary restraining order.  Moreover, the record demonstrates a consistent pattern by Petitioner, albeit a lengthier one, of seeking aid from various legal organizations, law enforcement, and Brazilian courts in pursuit of her daughter's return—none of which implies renunciation of parental rights or anything close to unequivocal acquiescence necessary for the Hague Convention defense [ECF No. 91-2 (deposition from Carla Viana, an attorney at the Center for Defense of Women, chronicling Petitioner's efforts with the Center beginning in September 2022 and with local police and state offices before that); ECF Nos. 136-6, 136-8, 136-9].

Nevertheless, Respondent argues that the "twenty-five month delay" in filing this proceeding is sufficient, by itself, to establish acquiescence [ECF No. 117 p. 3]. But Respondent fails to acknowledge that Petitioner was unaware of his whereabouts with H.E.D. for much of that time period and was seeking assistance from various entities in Brazil to locate H.E.D. and bring her back [*see* Tr. 57 (Petitioner testifying that Respondent changed his phone number three separate times to avoid Petitioner's calls)]. Indeed, Petitioner testified credibly during the Hearing that she immediately sought assistance from local counsel who worked diligently to locate Respondent—given the nine different countries that he traveled through by bus after the removal—eventually locating him in the United States via a video posted to Tik Tok [ECF No. 91-2 pp. 17–22, 30].

In sum, there is insufficient evidence of consent or acquiescence—explicit, implied, or otherwise. And to the degree that it took Petitioner additional time to file formal proceedings in the United States after securing counsel in multiple jurisdictions and navigating the complexities inherent in these proceedings, particularly given the language barrier at play [ECF No. 91-2], Respondent offers no evidence to believe that such delay was due to Petitioner's acquiescence to the retention.

### c. Grave Risk of Harm

Respondent argues in his Answers and Proposed Findings/Conclusions that a return order to Brazil poses a grave risk of harm to H.E.D. based on his allegation that the Child broke her clavicle while living with Petitioner—allegedly at the hand of her-then boyfriend—and that Petitioner lives in Ipiranga, a dangerous neighborhood of São Paulo, Brazil [ECF No. 124 p. 2; ECF Nos. 32, 55]. At the Evidentiary Hearing, Respondent also argued for the first time that Petitioner's past alleged failure to protect H.E.D. and the possibility that she may enter a new

romantic relationship constitute a grave risk of harm to the Child. Tr. 172. Petitioner disputes any notion of grave risk of harm [ECF No. 125 pp. 16–19]. According to Petitioner, the factual record does not support Respondent's unproven allegations of abuse by Petitioner's former boyfriend, and in any event, the circumstances underpinning Respondent's claim of alleged harm (abusive ex-boyfriend plus old neighborhood) no longer apply [ECF No. 125 pp. 16–19].

The Court may decide not to issue a return order if Respondent demonstrates by clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Art. 13(b); *Baran*, 526 F.3d at 1345; *see Gomez*, 812 F.3d at 1014 (holding "sufficiently serious threats to a parent can pose a grave risk of harm to a child"). "[T]he inquiry under the Convention is not whether the child had previously been harmed. Rather, the question is whether returning the child to [Brazil] would expose her to a grave risk of harm going forward." *Gomez*, 812 F.3d at 1015.

Respondent has not met his burden to show by clear and convincing evidence that return of H.E.D. to Petitioner would present a grave risk of harm.

First, regardless of whether Petitioner's former neighborhood (Ipiranga) is a dangerous "favela" as Respondent contends, Petitioner credibly testified that she no longer lives there. Tr. 88–90. The record is thus clear and unrebutted that Petitioner lives alone, in another neighborhood, almost an hour away from the disputed neighborhood. Tr. 9 (Petitioner credibly testifying that she now lives in Fazenda da Juta and has lived there since December 2024). Respondent offers nothing to impugn the safety of Petitioner's current living conditions.

Second, Petitioner has no continued romantic involvement with "Marc Elie," the man who Respondent asserts, without any reliable corroboration, allegedly injured the Child's clavicle.

17

Tr. 37–39.[12] Respondent's heavy reliance on the prospect of harm from Mr. Elie is therefore not a reason to find a present grave risk of harm, even assuming a factual basis existed to support Respondent's allegations (which there is not, *supra* p. 6).

Finally, Respondent cites Petitioner's alleged inability to protect H.E.D. from some future romantic relationship, but speculation falls woefully short of the standard to establish a grave risk of harm. Rather, Respondent appears to be challenging Petitioner's general ability to parent H.E.D. rather than presenting evidence of a present grave risk to her in Petitioner's care. This sort of argument is properly made, according to law, in the ongoing custody dispute in Brazil, [*see* ECF Nos. 136-6, 136-8, 136-9], which Respondent interrupted by wrongfully fleeing with H.E.D.

## CONCLUSION

Petitioner has established a prima facie case of wrongful retention under the Hague Convention. Respondent has failed to establish that any of the exceptions to the Convention apply here. To the extent Respondent makes a general plea to keep H.E.D. in the United States, the aims of the Convention clearly would not support such a request in this case. Return is therefore warranted. The Court neither makes nor purports to make any determination as to the underlying custody issue apart from redirecting the dispute back to the proper forum—Brazil.

---

[12] Although unnecessary to disposition of this Order, the Court notes that Respondent did not supply any reliable corroboration for his assertion that "Mark Elie" was physically abusive toward H.E.D. The most Respondent could muster was unreliable hearsay from H.E.D., purportedly transmitted to Respondent in July 2022. But as the Court determined, that statement is inadmissible, and H.E.D. is not competent to testify on such matters [*see* ECF No. 131].

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Petitioner's Verified Petition for Return of Child to Brazil [ECF No. 1] is **GRANTED**.

2. On or before **July 11**, **2025**, the parties shall ensure that H.E.D. is returned to Brazil under appropriate conditions.

3. On or before **June 20, 2025,** the parties shall meaningfully confer and jointly file a return plan, noting any disagreements. This return plan shall detail, with specificity, all aspects of H.E.D.'s return.

4. **Pursuant to the Court's Order to Show Cause, which remains in effect, Respondent is PROHIBITED from removing minor child H.E.D., or causing H.E.D. to be removed from the jurisdiction of this Court. If Respondent removes H.E.D. from the jurisdiction of this Court or causes H.E.D. to be removed from the jurisdiction of this Court, the Court shall issue a warrant for the arrest of Respondent and appearance for a contempt hearing. Additionally, the Court may issue an order directing that the Child's name be entered into the missing persons section of the national police computer system ("N.C.I.C.").**

5. <u>**The Clerk of Court shall not release any travel documents in this case until further order of the Court.**</u>

6. The Court retains jurisdiction as necessary to ensure compliance with this Order.

   **DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 10th day of June 2025.

   _____
   **AILEEN M. CANNON**
   **UNITED STATES DISTRICT JUDGE**

cc: counsel of record